TEACHERS INSURANCE AND
ANNUITY ASSOCIATION OF
AMERICA, Plaintiff,

v.

SHAMROCK BROADCASTING
COMPANY, INC., Defendant.

No. 79 Civ. 3369 (WCC).

United States District Court,
S. D. New York.

July 20, 1981.

m. Each candidate, at his own expense, shall have the right to have an observer other than himself present for the mailing of ballots, the removal of ballots from the post office, and the subsequent counting of the ballots.

6. All members meeting the eligibility criteria set forth in paragraph 5(e) shall be permitted to attend the nominations meeting.

7. All members meeting the eligibility criteria set forth in paragraph 5(f) shall be permitted to run for office.

8. All members meeting the eligibility criteria set forth in paragraph 5(1) shall be permitted to vote.

9. The Arbitrators seeking to supervise and conduct the nominations and election required by this order shall file an undertaking with the court indicating their consent to the terms and conditions of this order, and in addition, shall:

a. Provide for the designation of an official to answer inquiries and make reports on members' eligibility to hold office as set forth in paragraph 5(i).

b. Make all arrangements for distribution of campaign literature as set forth in paragraph 5(j) of this order.

c. Ensure that no member of the Arbitrators who participates in the supervision or conduct of the nomination and election required by this order shall have any interest in the outcome of the election.

10. Defendants Bart A. Griffiths, George Harris, and Local 82 are enjoined from violating the equal rights of members of Local 82, guaranteed by 29 U.S.C. § 411,

(a) to nominate candidates in the election to be conducted in accordance with this order, to vote in the election, to attend all meetings of Local 82 in which business related in any way to this election is conducted, and to participate in the deliberations and voting upon business of such meetings, subject to the rules and regulations of the constitution and bylaws of the union;

(b) to meet and assemble freely with other members and to express any views, arguments, or opinions relating to the nominations and election to be conducted in accordance with this order, and to express, at meetings of Local 82 in which business is conducted relating in any way to this election, any views upon candidates or upon any business properly before such meetings, subject to the rules and regulations established in this order and in the rules and regulations of the constitution and bylaws of the union.

11. This order shall remain in effect until further order of this court.

12. Local 82 shall pay the fees and expenses incurred by the Arbitrators in discharging their responsibilities under this order in the amount determined by the Court and shall advance to the Arbitrators the amounts necessary to cover the postage required to mail the notices and balloting materials necessitated by this order.

13. Plaintiffs are not required to post a security under Fed.R.Civ.P. 65(c).

Kaye, Scholer, Fierman, Hays & Handler, New York City, for plaintiff; Sheldon Oliensis, Milton Sherman, Karen E. Katzman, New York City, of counsel.

Hall, McNicol, Hamilton, Clark & Murray, New York City, for defendant; Ronald S. Herzog, Barbara A. Mentz, New York City, of counsel.

## OPINION AND ORDER

CONNER, District Judge:

This case is presently before the Court on the motion of defendant Shamrock Broadcasting Company, Inc. ("Shamrock") to compel plaintiff Teachers Insurance and Annuity Association of America ("Teachers") to produce certain documents, Rule 37(d), F.R.Civ.P. At issue is whether Teachers waived the right to assert the attorney-client privilege with respect to documents which it previously turned over to the Securities and Exchange Commission ("SEC") in response to an agency subpoena. For purposes of this motion, it has been assumed that (1) absent a waiver, the attorney-client privilege would attach to the documents sought; (2) all the documents sought were in fact turned over to the SEC; and (3) Teachers turned them over without making any express claims of confidentiality or attorney-client privilege.

*Background*

Teachers brought this action initially against the Starr Broadcasting Group, Inc. ("Starr") to recover damages for Starr's failure to honor Teachers' exercise of two Starr stock warrants at the exercise price to which Teachers contended it was entitled. After the lawsuit was commenced, Starr merged with Shamrock; the parties subsequently agreed to substitute Shamrock for Starr as the defendant in this action.

Shamrock asserts as an affirmative defense that the warrant exercise price claimed by Teachers, Starr's primary lender, was granted to Teachers by Starr only in the context of an overall agreement violative of the securities laws and of common-law principles. Starr avers that under that agreement, Teachers, in conspiracy with four individual principals and directors of Starr, consented to Starr's acquisition of certain unprofitable movie theatre and other investments made by those directors in return for an increase in the rate of return on Teachers' outstanding loans to Starr and a reduction in the exercise price of Starr stock warrants already held by Teachers. The 1975 transactions in which Starr acquired the investments of its four directors

were the subject of an SEC investigation; in the course of that investigation, the SEC issued a subpoena on September 22, 1976 requiring Teachers to produce:

"[f]or the period January 1, 1970 to the present, all records, statements and documents, including but not limited to correspondence, notes, memoranda, loan office credit files, agreements and proposed agreements, contracts, applications, account information, studies, reports, statements of account, minutes of any loan committee or executive committee meetings, financial statements, appraisals, telephone logs, appointment calendars, cancelled checks, deposit slips and all other papers, records and documents, and drafts of any of the foregoing which relate directly or indirectly to any of the following:

"1. Loans to the Starr Broadcasting Group, Inc. and its subsidiaries and affiliates;

"2. Loans to any present or former officers or directors of the Starr Broadcasting Group, Inc.;

"3. Loans to Ryder Pictures, Inc.;

"4. Loans to Bryan Pictures, Inc.;

"5. Loans to Sitco Ltd. [the limited partnership through which, Shamrock alleges, the four Starr officers and directors acquired the movie theatres and other investment properties later transferred to Starr]; and

"6. All other accounts (other than ordinary checking accounts) maintained by or in which there is a beneficial interest, for individuals or other entities affiliated with the Starr Broadcasting Group, Inc., its officers and directors; Ryder Pictures, Inc.; Bryan Pictures, Inc.; or Sitco, Ltd."

The subpoena further recites that the SEC may seek a court order directing compliance should Teachers not produce the documents called for; that the information sought was to be used "principally for the purpose of investigating possible violations of the federal securities laws"; and that the information obtained might also be used "[i]n any proceeding where the Federal securities laws are in issue or in which the Commission or past or present members of its staff is a party or otherwise involved in an official capacity." [1]

*Discussion*

Because the case law is in apparent conflict as to whether a disclosure of material protected by an attorney-client privilege to an investigating government agency constitutes waiver of the privilege, I will review the cases and underlying principles in some detail.

Wigmore summarizes the general principle of the attorney-client privilege as follows:

"(1) Where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection be waived." VIII Wigmore, Evidence § 2292 (McNaughton rev. ed. 1961).

The purpose of the privilege is to encourage full and frank discussions between attorney and client, and thus aid the attorney in giving advice to the client, aid the client in complying with the law, and serve the overall public interest in ensuring adequate legal representation for litigants and encouraging knowledge of and compliance with the law. *Upjohn Co. v. United States,* 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981); *In re Horowitz,* 482 F.2d 72, 81 (2d

1. In 1979, the SEC filed a complaint in the United States District Court for the District of Columbia charging Starr, its directors, including the four officer-directors whose investment holdings were transferred to Starr, and a bank which had financed acquisitions by Sitco, Ltd., the four officer-directors' investment vehicle, with violations of Section 17(a) of the Securities Act of 1933, Sections 7, 10(b), 13(a), 13(d), 14(a) and 16(a) of the Securities Exchange Act of 1934, applicable regulations issued under those sections, and Regulation G of the Federal Reserve Board. That lawsuit was terminated by a consent decree without any admission of liability by the defendants.

Cir.), *cert. denied*, 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973). Because the privilege covers materials which otherwise would be discoverable, and thus limits the opposing party's access to evidence, it is to be construed as narrowly as is consistent with its purpose. *Horowitz, supra*, 482 F.2d at 81; *In re Grand Jury Subpoena*, 81 F.R.D. 691, 693 (S.D.N.Y.1979); VIII Wigmore, Evidence § 2192.

One of the most critical attributes of the privilege is that it protects only communications which the client has made in confidence and has kept confidential. *Horowitz, supra*, 482 F.2d at 81–82 (ruling that clients waived privilege by submitting to their accountants records which included privileged matter: "It is not asking too much to insist that if a client wishes to preserve the privilege under such circumstances, he must take some affirmative action to preserve confidentiality," *id.* at 82). Thus, if a third party is present when a communication is made, no privilege attaches, see McCormick on Evidence (1972 ed.) § 91 and cases cited therein. And if a client voluntarily discloses an oral communication or makes public a document containing a communication otherwise privileged, he is held to have waived the privilege. *Horowitz, supra; R. J. Herely & Son v. Stotler*, 87 F.R.D. 358 (N.D.Ill.1980); *United States v. Aronoff*, 466 F.Supp. 855 (S.D.N.Y.1979). However, disclosure is not a waiver if it is compelled by court order, *Transamerica v. IBM*, 573 F.2d 646, 651 (9th Cir. 1978) (Waterman, J.); *Duplan Corp. v. Deering Milliken*, 397 F.Supp. 1146 (D.S.C. 1975), or made pursuant to a stipulation reserving the right to assert the privilege, *IBM v. United States*, 471 F.2d 507 (2d Cir. 1972).

Another attribute of the privilege is that it cannot be used "as a sword," offensively—*i. e.*, that a party cannot, by selective invocation of the privilege, disclose documents or give testimony favorable to that party while failing to disclose cognate material unfavorable to that party. VIII Wigmore, Evidence, § 2327. As a corollary to this principle, courts have ruled that when a party discloses part of an otherwise privileged communication, he must in fairness disclose the entire communication, or at least so much of it as will make the disclosure complete and not misleadingly one-sided. Thus, the disclosure of only part of a document or some of a series of documentary communications has been deemed an "involuntary waiver" of the privilege with respect to so much of the undisclosed document or documents as will make the disclosure complete. *Herely, supra; Aronoff, supra.*

Certain cases have suggested an additional gloss to discussions of both voluntary waiver and involuntary waiver, or forced disclosure for the sake of completeness: that because cooperation with government investigations should be encouraged, and because application of normal principles of waiver to disclosures made to government investigating agencies might discourage such disclosure, normal waiver principles should be applied only if a ruling that the disclosing parties had waived the privilege would not adversely affect the government's ability to investigate. See, *e. g., Diversified Industries, Inc. v. Meredith*, 572 F.2d 596, 611 (8th Cir. 1977) (investigations by independent outside counsel into allegations of corporate misconduct should be encouraged); *Byrnes v. IDS Realty Trust*, 85 F.R.D. 679 (S.D.N.Y.1980); *In re Grand Jury Subpoena dated July 13, 1979*, 478 F.Supp. 368 (E.D.Wis.1979); *Duplan v. Deering Milliken, supra*, 397 F.Supp. at 1163. Other cases, however, have rejected this reasoning. See *In re Weiss*, 596 F.2d 1185 (4th Cir. 1979); *In re Penn Central Commercial Paper Litigation*, 61 F.R.D. 453 (S.D.N.Y.1973).

Analytically, the present motion concerns "voluntary waiver" by full disclosure, not an "involuntary waiver" based on the completeness rule, since it has been stipulated for purposes of the motion that all the documents defendant seeks were disclosed in full to the SEC in response to the 1976 SEC subpoena. To be considered are (1) whether plaintiff's disclosure to the SEC was in fact voluntary, and thus represented

a decision by Teachers that it had no interest in keeping these particular communications confidential, and (2) whether, even if Teachers voluntarily waived its right to assert the privilege at the time it turned over the documents to the SEC, this Court should, for reasons of public policy, disregard the usual strict construction of the waiver doctrine as applied to the attorney-client privilege and deem the privilege to have been waived only for purposes of the SEC investigation.

## 1. Voluntariness of Waiver

■ On this record, there is no basis for concluding that Teachers' disclosure to the SEC was involuntary or compelled. While Teachers made the disclosure pursuant to an agency subpoena, Teachers could have objected to the subpoena on grounds of privilege, see, *e. g., Osterneck v. E. T. Barwick Industries*, 82 F.R.D. 81, 83 (N.D.Ga. 1979); *cf. Aronoff, supra* (stipulation on waiver of privilege discussed between United States Attorney and client in securities-related investigation); 17 C.F.R. § 200.-80–.83 (provisions for asserting claim of confidentiality to cover Freedom of Information Act requests for documents produced to the SEC). Instead, Teachers chose to produce the material requested without objection. This is not analogous to the court-ordered disclosure in *Transamerica, supra,* or *Duplan, supra,* nor to the appearance of federal agents on the disclosing parties' premises which was deemed potentially coercive in *United States v. New Wrinkle,* 1954 Trade Cases ¶ 67,883 (S.D.Ohio 1954), cited in *Duplan, supra.* The production and disclosure were voluntary.

## 2. Limitation of Waiver

As indicated above, this issue turns on whether the public interest in securing ready compliance with SEC subpoenas overrides the public interest in encouraging full and complete discovery by limiting invocation of the attorney-client privilege to those instances in which it will protect communications which the client has consistently sought to keep private.

This issue should first be distinguished from that raised in certain cases cited by the parties which discuss waiver in the context of a request or demand for underlying or background documents after a client has disclosed a report or summary to the SEC. There, the issue is completeness, or involuntary waiver, and decisions have turned on considerations of fairness, *i. e.,* how much additional material need be disclosed to make the communication already disclosed complete or not misleading, and the ability of the requesting party to gain the desired documents elsewhere. See, *e. g.,* the decisions of the lower courts in *Upjohn, supra,* on the waiver issue (an issue not raised in that case before the Supreme Court) at 600 F.2d 1223, 1227 and n.12 (6th Cir. 1979), and at 78–1 U.S.T.C. ¶ 9437 (W.D.Mich.1978); *In re Grand Jury dated July 13, 1979, supra* (when report discussing interviews turned over to SEC, privilege not waived as to interview notes themselves); *Byrnes v. IDS Realty Trust,* 85 F.R.D. 679, 689 (S.D.N.Y. 1980); see also Memorandum and Order of Magistrate Harold J. Raby, dated December 28, 1979, in *Byrnes* at 3 (issue whether prior "submission [to the SEC] of materials *relating to* " the documents sought in *Byrnes* amounted to a waiver) (emphasis added).

In three cases cited above, *Diversified, In re Penn Central* and *Aronoff,* courts have specifically considered whether voluntary disclosures of communications to the SEC waived the privilege for purposes of later civil litigation in which production of those communications was sought.

In *Aronoff,* the court reached the issue of what communications had actually been disclosed to the SEC and determined that a waiver would occur only with respect to the precise disclosures made, *id.* at 858–60. It did not reach the issue of whether a public policy rationale would bar the use of direct disclosures to the SEC in subsequent proceedings.

In *In re Penn Central,* then Chief Judge Edelstein of this district was supervising consolidated discovery proceedings in private securities law actions brought by purchasers of Penn Central commercial paper

prior to the Penn Central bankruptcy. Plaintiffs sought to compel production of transcripts of certain testimony before the SEC and documents previously submitted to the SEC by counsel to The First Boston Corporation, managing underwriters of an offering in which the syndicate included the principal defendant. The testimony and documents had been supplied to the SEC in response to a request by SEC investigators. Plaintiffs contended that counsel's failure to assert the privilege on behalf of his client before the SEC constituted an absolute waiver of the privilege. Defendant maintained that the privilege had not been waived on two grounds. The first was that "as a matter of public policy," disclosure in a nonpublic SEC investigation should not be deemed to be a waiver because, if it were deemed a waiver, "parties will be reluctant to cooperate with government authorities in such investigations." *Id.* at 462. The second was that disclosing counsel only consented to a limited waiver for purposes of the SEC investigation. *Id.* at 462–63. Judge Edelstein ruled generally that since no claim was made that the disclosure was not voluntary or made without an opportunity to claim the privilege, the privilege would, under usual standards, have been waived; that the public policy argument concerning encouragement of government investigations was contrary to the weight of authority limiting the instances of application of the privilege to those instances in which secrecy and confidentiality have been maintained; and that allowing invocation of the privilege as to counsel's disclosures to the SEC would, in effect, be to permit selective waiver of the privilege, in violation of the requirements of fairness and completeness. *Id.* at 464 and n.26. In denying specific claims of privilege for the documents turned over to the SEC, he relied on, *inter alia, United States v. Krasnov,* 143 F.Supp. 184 (E.D.Pa.1956), *aff'd,* 355 U.S. 5, 78 S.Ct. 34, 2 L.Ed.2d 21 (1957), in which the court ruled that when documents had been produced in response to a grand jury subpoena without any claim of attorney-client privilege, the privilege was waived. 143 F.Supp. at 190–91.

In *Diversified,* the issue before the court was whether a corporate defendant, Diversified Industries, had waived its right to assert the privilege with respect to a memorandum and report prepared by a law firm hired by the corporation to investigate the corporation's establishment of a "slush fund" and instances of reported bribery with slush fund monies and minutes of the board of directors discussing the memorandum and subsequent report. All of these documents had been turned over to the SEC without protest in response to an agency subpoena issued during an SEC investigation into the affairs of the corporation. Anticipating the decision of the Supreme Court in *Upjohn,* the Eighth Circuit, sitting *en banc,* ruled that the report and the relevant portions of the corporate minutes were privileged. The court then determined that the corporation, by turning these documents over to the SEC, had waived the privilege only for purposes of the SEC investigation itself, not for purposes of subsequent litigation:

"As Diversified disclosed these documents in a separate and nonpublic SEC investigation, we conclude that only a limited waiver of the privilege occurred. See *Bucks County Bank & Trust Company v. Storck,* 297 F.Supp. 1122 (D.Haw. 1969). *Cf. United States v. Goodman,* 289 F.2d 256, 259 (4th Cir.), vacated on other grounds, 368 U.S. 14 [82 S.Ct. 127, 7 L.Ed.2d 75] . . . (1961). To hold otherwise may have the effect of thwarting the developing procedure of corporations to employ independent outside counsel to investigate and advise them in order to protect stockholders, potential stockholders and customers.

"In concluding, we note that the litigants are not foreclosed from obtaining the same information from non-privileged sources. Litigants may still examine business documents, depose corporate employees and interview nonemployees, [and] obtain preexisting documents and financial records not prepared by Diversified for the purpose of communications with the law firm in confidence." 572 F.2d at 611.

In *Bucks County*, cited in *Diversified*, the court ruled that a client did not waive the attorney-client privilege by testifying at a suppression hearing in a criminal prosecution of the client. The court construed all testimony given at such a hearing as nonpublic, *i. e.*, intended to remain undisclosed, since the evidence adduced at a suppression hearing "... is not usable against the defendant even in the criminal case in chief in connection with which a return of property or suppression of evidence is sought." 297 F.Supp. at 1123.

In *Goodman, supra,* the second case relied on by the *Diversified* court, the privilege whose waiver was at issue was the Fifth Amendment privilege against self-incrimination. The court there ruled that a defendant's prior disclosure to investigating officials in connection with an earlier legal proceeding does not constitute a waiver of the Fifth Amendment privilege with respect to a subsequent legal proceeding.

In *Byrnes* and *In re Grand Jury Subpoena dated July 13, 1979*, the courts, when faced, as noted above, with the different legal issue of whether partial disclosure required complete disclosure of all privileged communications on the subject matter on fairness grounds, indicated *in dicta* that even as to the documents or testimony actually furnished to the SEC, the privilege should not be deemed to have been waived for purposes of later proceedings. Judge Tenney in *Byrnes* stated that, because of the posture of the case, he was obliged to follow Eighth Circuit law, *i. e., Diversified*; but that, in any event, he would rule that disclosure to the SEC was not an absolute waiver because "voluntary disclosures to agencies should be encouraged rather than requiring that agency requests or subpoenas be fought to the hilt," 85 F.R.D. at 689. In the Wisconsin grand jury case, the court stated:

> "... I do not believe that limited release of the report to the Securities and Exchange Commission, the Internal Revenue Service and New York grand jury should preclude the corporations from asserting the privilege as to the notes [interview notes taken by outside counsel retained to investigate 'questionable payments' by corporate employees]. It is apparent that voluntary cooperation with the Securities and Exchange Commission or with an Internal Revenue Service or grand jury investigation would be substantially curtailed if such cooperation were deemed to be a waiver of a corporation's attorney-client privilege." *Id.* at 372–73.

In *In re Weiss*, 596 F.2d 1185 (4th Cir. 1979), the Fourth Circuit declined to follow *Diversified* and cited *In re Penn Central* in ruling that when a lawyer had been given permission by his clients to testify in a private SEC investigation about certain otherwise privileged matters, the privilege had been waived, and the attorney could be compelled to testify on those matters in a subsequent grand jury proceeding.

Finally, in the analogous area of waiver of work-product immunity, recent decisions have impliedly rejected the *Diversified* rationale by indicating that that privilege could be waived by disclosure to investigating government agencies if the disclosure was inconsistent with the maintenance of secrecy from the disclosing party's adversary. *United States v. AT&T*, 1980–2 Trade Cases ¶ 63,533 (D.C.Cir.1980); *Litton v. AT&T*, No. 76 Civ. 2512 (WCC), opinion dated October 24, 1980; *GAF Corp. v. Eastman Kodak*, 85 F.R.D. 46 (S.D.N.Y.1979). These cases have recognized that the work-product privilege could be maintained if disclosure were conditioned by a stipulation of confidentiality or if subsequent use of the documents were limited by a protective order covering the initial production, see *United States v. AT&T*. They did not suggest that the policy consideration of encouraging cooperation with government investigations should limit findings of waiver.

■ After considering the general principles outlined in *Horowitz*, Wigmore and McCormick, the specific decisions on waiver as a result of production to the SEC, and the underlying policy arguments, I am of the opinion that disclosure to the SEC should be deemed to be a complete waiver

of the attorney-client privilege unless the right to assert the privilege in subsequent proceedings is specifically reserved at the time the disclosure is made.

As both Wigmore and McCormick indicate, the very rationale of the privilege rests on the consideration that the matters for which the privilege is sought are private. In *Horowitz*, Judge Friendly reaffirmed that the client must take pains to ensure that the confidentiality of the communications has been preserved before he may invoke the privilege. This consideration underlies the rejection of the public policy argument for limited waiver in *In re Penn Central*.

*Diversified*, the only case directly on point in opposition to *In re Penn Central*, does not advance any compelling reason for overriding this basic attribute of the attorney-client privilege. First, the two cases relied upon in *Diversified, Bucks County* and *Goodman*, do not appear to compel a ruling in this case that the privilege was not absolutely waived. The SEC investigation here, while "nonpublic" in the sense that information gathered by the SEC was not immediately made part of a public record, was nevertheless a proceeding which could quite possibly result in litigation, as the subpoena itself indicated. In addition, under the applicable regulations, the information gathered would be made public at the close of the proceeding unless a Freedom of Information Act confidentiality request were made. Thus, the SEC proceeding did not have the private nature which the court in *Bucks County* found to exist with respect to a suppression hearing. Moreover, *Bucks County*'s ruling rests on an analogy to the policy grounds protecting a criminal defendant's right to press Fourth and Fifth Amendment challenges to the introduction of evidence without waiving the privilege against self-incrimination at trial. *Goodman*, the other case cited in *Diversified*, rests on the principle that a party only waives the Fifth Amendment

privilege against self-incrimination by a disclosure in the legal proceeding in which the privilege is claimed, *i. e.*, that waiver of that privilege in one proceeding does not constitute an absolute waiver of the privilege for subsequent proceedings. Such constitutional considerations limiting application of usual waiver principles are not implicated here, where no Fourth Amendment protections apply and where no possible self-incrimination has been suggested.

Second, the reliance of the *Diversified* court on the need to encourage hiring of outside counsel to investigate suspected instances of corporate conduct is inapposite here.

*Diversified*'s third rationale, that the availability of the desired information elsewhere should preclude a determination of waiver with respect to documents actually turned over to the SEC, is unpersuasive here. Such a consideration is analytically appropriate to the fairness test to be applied in the partial disclosure or involuntary waiver situation, see VIII Wigmore § 2327, where the concern is that the opposing party obtain a complete version of the communication. There, the court need not rule that "involuntary waiver" has occurred if the opposing party has access to the complete communication through other sources. This, however, is a complete disclosure situation; the issue is not whether the opposing party has a fair picture of the nature of the communication, but whether the confidentiality of the communication integral to the attorney-client privilege has been breached. The availability of the information from sources other than the disclosing party has no bearing on whether the disclosing party has preserved the confidentiality of the communication.[2]

Finally, it is not apparent to this Court that, as suggested in *Diversified, Byrnes*, and the Wisconsin grand jury case, a ruling that waiver has occurred in those cases

**2.** This discussion is equally applicable to *Byrnes*, 85 F.R.D. at 689, where the Court indicated approval of a general limited waiver standard in a partial or incomplete disclosure case and then suggested that the limited waiver principle would be applied only if it were supported by considerations of fairness.

where the disclosing party has simply turned over material to the SEC without reservation will have so deleterious an effect on the SEC's ability to investigate that this consideration should wholly outweigh the usual limited application of the attorney-client privilege. The courts in those three cases appear to have assumed that only two treatments of the waiver issue exist: (1) absolute waiver at the time of disclosure, potentially discouraging corporate cooperation with the SEC (or as in *Diversified*, corporate-sponsored investigations by outside counsel) or (2) no waiver whatsoever for purposes of subsequent litigation. However, a third alternative exists, as suggested both in cases discussing the attorney-client privilege, see *Aronoff, supra; Osterneck, supra; In re Penn Central, supra*, and in cases discussing the work-product privilege, see *United States v. AT&T, supra* : waiver only if the documents were produced without reservation; no waiver if the documents were produced to the SEC under a protective order, stipulation or other express reservation of the producing party's claim of privilege as to the material disclosed. It does not appear that such a reservation would be difficult to assert, nor that it would substantially curtail the investigatory ability of the SEC, as such stipulations or protective orders have clearly been used in investigations by the SEC, Justice Department and United States Attorneys, and as the SEC regulations provide for designation of documents turned over as confidential under the Freedom of Information Act, analogous to a reservation of confidentiality for purposes of the attorney-client privilege. Moreover, a contemporaneous reservation or stipulation would make it clear that, as required in *Horowitz*, the disclosing party has made some effort to preserve the privacy of the privileged communication, rather than having engaged in abuse of the privilege by first making a knowing decision to waive the rule's protection and then seeking to retract that decision in connection with subsequent litigation.

Accordingly, the Court will not rule that Teachers has not waived the privilege as a matter of law; and must reach the specific privilege, disclosure and reservation issues assumed for purposes of this motion. The parties shall contact the Court within five days of the date of this Opinion and Order to arrange referral to a Magistrate, for hearing and determination, of the specific issues of whether the documents sought were in fact privileged, which documents were turned over to the SEC, and whether express claims of confidentiality were made as to the documents turned over at the time they were so disclosed.

SO ORDERED.